[No. 25876. Department Two. April 20, 1936.]

AMERICAN FRUIT GROWERS, INC., *Appellant*, v. EDNA S. CALVERT, *as Executrix, Respondent.*[1]

[1]Reported in 56 P. (2d) 1307.

30

*Kerr, McCord & Carey,* for appellant.

*Wright, Jones & Bronson* and *Venables, Graham & Howe,* for respondent.

HOLCOMB, J.—By its complaint in the lower court, appellant sued to recover from respondent, as executrix of the estate of William Calvert, deceased, $2,768.55 claimed to be owing on account of the operation of an apple orchard in the Chelan district during the fruit year of 1931-32.

The complaint, after alleging that appellant is a domestic corporation, averred that, prior to June 28, 1933, Edna S. Calvert and William Calvert were husband and wife; that, during the fruit year of 1931-32, appellant performed services and advanced cash and materials at the request of William Calvert, with his continuous acquiescence, knowledge and approval; and that, during that period, William Calvert delivered fruit crops to appellant, which were sold, leaving a balance of $2,768.55 owing to appellant. It is further alleged that William Calvert died on June 28, 1933, and a proper claim was filed against his estate, which was rejected by his executrix, Edna S. Calvert.

Respondent first filed an answer making certain formal admissions and denials, the effect of which was to put appellant to its proof as to the agreement, which

original answer contained no cross-complaint. Thereafter, respondent availed herself of her right to take discovery depositions of E. C. Schultz and M. S. Foster, officers and stockholders of appellant and its subsidiary, Northwestern Fruit Exchange. These depositions, taken before the trial, were not offered in evidence by respondent, but were, during the trial, offered in evidence by appellant and marked as its exhibits for identification. The two witnesses were required to testify, at the instance of respondent, fully as to their transactions with Calvert in his lifetime, in consequence of which transactions appellant operated the orchard during the year in question. They were also required to, and did, produce certain documentary evidence, which was produced and submitted to the attorney for respondent for his inspection.

After the depositions had been taken and the documentary evidence produced and inspected, an amended answer and cross-complaint was filed before trial. The amended answer made substantially the same admissions and denials as the original answer, but in it respondent cross-complained against appellant for the sum of $616.58, claimed to be owing by appellant to the estate of Calvert because of transactions relative to the same orchard, which allegation was denied by appellant. On trial without a jury, the trial court denied appellant any recovery, but allowed respondent $608.64 with interest on her cross-complaint.

There is no dispute as to the facts leading up to this controversy. Calvert, the decedent, was the owner of a piece of real estate in the Lake Chelan district which he contracted to sell to Frank Holder in 1926, under an installment contract providing for the purchase price to be paid by delivery of twenty per cent of the crop each year. The contract further provided:

"It is one of the conditions of this contract that the purchaser shall not give or permit any encumbrance upon the crop to be raised upon said premises which shall, in any way, interfere with the delivery of the twenty per cent (20%) of the crop above referred to, to the vendors, and the vesting in the vendors of the full, absolute and unencumbered title thereto and right to possession thereof."

No specific amount was payable under the contract, and so long as the purchaser turned over annually to Calvert twenty per cent of the production of the land, he would not be in default upon payment of the purchase price.

Appellant, either directly or through its subsidiary, Northwestern Fruit Exchange, apparently entered into some kind of an arrangement with Holder, the exact nature of which is not definitely shown, under which they financed his operations and in return received the right to deliver and market the crop. There was probably some loss resulting from these operations, which caused delay in making payment to Calvert upon his share of the crop. In the summer of 1928, this situation resulted in a settlement of accounts up to the beginning of that year, as shown by a statement in evidence in which the purchase contract between Calvert and Holder is specifically mentioned. The contract is referred to as having been assigned to appellant for its protection, and it was provided that, instead of the specific percentage of fruit being turned over to Calvert each year, appellant would pay him twenty per cent of the returns of the sale of the fruit as long as the contract existed and it had the marketing of the crop.

After that, appellant continued to finance Holder through the year 1930, at which time it had a very large balance due from him. Appellant was then desirous of securing some guarantee from Calvert, or a

reduction in the purchase price payable by Holder under the contract above referred to, as security for its advances. Various meetings were held, at which certain adjustments were proposed, but no definite agreement was reached. These negotiations were carried on until about April 1, 1931, at which time appellant was continuing to look after the orchard in preparation of the coming season.

On April 1, 1931, Foster wrote Calvert a letter enclosing a proposed memorandum of agreement referring to a new contract to be made with Holder. Calvert returned the proposed agreement with certain changes on April 7. On April 8, Foster replied that he would get in touch with Calvert the next day, when in Seattle. He failed to do so, and on April 13 wrote to Calvert saying he would be over in about ten days to discuss some other matters and wished to know about the Holder matter, "as the season is getting late and the orchard needs attention without further delay." In answer to this letter, Calvert wrote, under date of April 15:

"American Fruit Growers,
    Wenatchee, Washington.
"Gentlemen:            ATTENTION: Mr. Myron Foster
    "Your favor of April 8th and 13th received and noted. As explained in my letter of the 7th, I thought the understanding was very clear as to the time covered under the new arrangement, namely, the years 1931-32 and 33.

    "If you will remember in our conversation the question came up of the 1930 crop and I said that was something that had already passed. In other words, the way this situation seems to line up at this time is that I see no reason why I should contribute $1,300 to make up part of the losses.

    "In the first place, I had nothing to do with your arrangement with Holder, as that was something that was taken on by yourselves without even a suggestion

on my part that you do it. Furthermore, the contract between Holder and myself is one that is entirely separate from any arrangement that he might make for the marketing of his portion of the crop and I am perfectly willing to go on with the arrangement that we made, provided it covers the years 1931, 1932 and 1933, but I am not willing to forego what is due me on the 1930 crop.

"If you care to advance whatever is necessary for the immediate care of the orchard until you can get over here and we can go over the matter more thoroughly if you wish to, I will be willing to reimburse you for any advances made on this year if we do not come to a satisfactory arrangement.

"Yours very truly,

"WM. CALVERT."

In reliance upon that letter, appellant furnished the labor and material necessary to produce the crop during the 1931 season. Its subsidiary, Northwestern Fruit Exchange, marketed the crop. At the end of the shipping season for that year, there was a deficit of $2,768.55.

At the outset, a question of evidence is presented, which is of primary importance and must be first determined.

On appeal, appellant contends, first, that the evidence at the end of the trial clearly entitles it to judgment for the amount above claimed; second, that it was reversible error of the trial court to reject the testimony of the depositions of Schultz and Foster taken by respondents as adverse witnesses; and third, that, in any view of the facts and circumstances, no judgment should be sustained on the cross-complaint of respondent.

It will be noted that the depositions of Schultz and Foster were not offered by respondent. On the contrary, counsel for respondent stated that they would not be offered by him. Six letters, not including that

dated April 15, 1931, were identified by Foster while on the stand at the request of counsel for respondent, who then stated he would not offer them in evidence. The depositions were filed in the office of the clerk of the lower court on May 13, 1935. They had been ordered published at the request of one of the counsel for appellant.

The trial court seemed to act upon the theory that the witnesses were both present and could testify in person, and therefore their depositions were not admissible. Counsel for respondent objected to the introduction of the depositions and to certain testimony given by Schultz and Foster on the witness stand, on the ground that they constituted transactions with a person since deceased, and therefore incompetent under the provisions of Rem. Rev. Stat., § 1211 [P. C. § 7722].

Some of the cases cited from this court by both parties are inapt. For instance, *Neis v. Farquharson,* 9 Wash. 508, 37 Pac. 697; *Beaston v. Portland Trust & Savings Bank,* 89 Wash. 627, 155 Pac. 162, Ann Cas. 1917B, 488, relied upon by appellant, were cases where the testimony was taken before the death of the party, when competent. However, certain cases relied upon by appellant are apt and are very decisive.

In this case, as was true in *Robertson v. O'Neill,* 67 Wash. 121, 120 Pac. 884, the testimony by the witnesses Schultz and Foster in their depositions as to their transactions with Calvert were clearly incompetent under the provisions of § 1211, *supra.* It was there held that the error was waived merely by cross-examination touching entries of an account between the deceased and appellant. The court there said:

"The purpose of the statute is to prevent the living from taking an unfair advantage of the estate of the dead. It would, however, be palpably unjust to permit

the representative of a deceased person to use the adverse party to the extent that it might aid him in defeating a claim or in establishing an independent claim in favor of the estate, and then claim the benefit of the statute when the adverse party sought to qualify or explain his testimony. This the law will not permit. [Citing numerous cases.]''

That principle, that the statute above cited in excluding parties in interest from testifying as to transactions with decedents may be waived as well as enforced, has been several times reaffirmed by this court. *Levy v. Simon,* 119 Wash. 179, 205 Pac. 426; *Johnson v. Clark,* 120 Wash. 25, 206 Pac. 914; *Floe v. Anderson,* 124 Wash. 438, 214 Pac. 827, and *Gregory v. Peabody,* 157 Wash. 674, 290 Pac. 232.

It ought now to be considered as settled in this jurisdiction.

██ Respondent contends, however, that those decisions were based upon other statutes, or other facts and circumstances; and that, in the present action, the depositions of these parties as adverse witnesses were taken under our rules of practice, Rule VIII, subd. 5, 159 Wash. lxii, relating to the taking of depositions, and that those rules are merely provisions for discovery of facts from an adverse party by a party to the action necessary for his cause, or defense.

That is not the only purpose. We have statutes, Rem. Rev. Stat., §§ 1225 to 1230 [P. C. §§ 7759 to 7764], inclusive, providing for interrogatories to an adverse party witness, or for examination at the trial as an adverse witness, which are very cumbersome and sometimes abused by litigants. It was for the purpose of making definite and simplifying the practice that our rules of practice above cited were adopted by this court. While they are the same as statutes, they are not to be presumed as in any way limiting other statutes relating to the same subject matter, but are for

the purpose of supplementing or enlarging them. Under our cited rule, a party witness is powerless to resist. If jurisdiction is acquired, he has no option, but must give testimony after taking oath that he will testify fully and truthfully.

Rem. Rev. Stat., §§ 1231 and 1244 [P. C. §§ 7726, 7729], prescribe when and how depositions may be taken, and that such depositions may be used by either party upon the trial, or other proceeding, "to be read in evidence" by either party

" . . . subject to all legal exceptions to the competency or credibility of the witness, or the manner of taking the deposition. . . ."

The statute relating to depositions seems to be substantially the same as a statute cited and relied upon in respondent's additional authorities in Arizona, 1928 Rev. Code of Arizona, §§ 4440 and 4444. On examination of that entire statute, it does not appear to us that it is any more of a disclosure statute than our own. It relates simply to the taking of depositions, as do our last above cited sections. Consequently, the case cited by respondent, *Starkweather v. Conner,* 38 P. (2d) (Ariz.) 311, is inapt, where the court said that, because of that peculiar statute, the taking of the deposition of the opposite party by plaintiff, when it was not offered in evidence by him, did not waive his right to take advantage of the statute rendering his testimony incompetent.

Respondent also declares that two decisions cited by her, *Prince v. Abersold,* 123 Ohio St. 464, 175 N. E. 862, and *Clayton v. Ogden State Bank,* 82 Utah 564, 26 P. (2d) 545, are well-reasoned cases and should control this case upon that question. We do not concur therewith. In the *Prince* case, *supra,* the supreme court of Ohio cited not a single authority. They simply declare, *ipse dixit,* that:

"After a careful examination of these decisions of other states, a majority of the court is of the opinion that the better and safer rule is that the mere filing of a deposition taken of an adverse party does not waive the inhibition of the statute against the testimony of the party whose deposition has been so taken."

The *Clayton* case, *supra,* was a case where the parties had stipulated that the depositions might be taken subject to any exception that might be interposed if the witness were present and testified at the trial. That court cited and quoted many of the conflicting cases upon the question of waiver, but then rested its decision upon the above stipulation, which it said "puts an end to the argument," as it should. Those cases are not persuasive.

The supreme court of California held in *McClenahan v. Keyes,* 188 Cal. 574, 206 Pac. 454, that, under a statute similar to our § 1211, *supra,* where a deposition of the plaintiff in the cause had been taken by the executor, who later at the trial objected to the testimony and declined to introduce the deposition, although the witness was incompetent as against the executor, the incompetency could be and was waived. The provision of the California code, under which the deposition was taken, contained the qualifying clause that it might be introduced in evidence "subject to all legal exceptions," and is similar to our statute.

We find that the great weight of authority is to the same effect. Among the many cases that so held which we have examined, in addition to our own heretofore cited, are: *Hodge v. St. Louis Union Trust Co.,* 261 S. W. (Mo.) 67; *McCoy v. Ferguson,* 249 Ky. 334, 60 S. W. (2d) 931, 90 A. L. R. 891; *Andrews v. Smith,* 98 N. C. 34, 150 S. E. 670, 2 Am. St. 312; *Golder v. Golder,* 102 Kan. 486, 170 Pac. 803; *Cox v. Gettys,* 53 Okla. 58, 156 Pac. 892; *Barrett v. Cady,* 78 N. H. 60,

96 Atl. 325; *Allen v. Pollard,* 109 Tex. 536, 212 S. W. 468; *Thomas v. Irvin, Adm'r,* 90 Tenn. 512, 16 S. W. 1045. In the last cited case, the opinion is by Judge Lurton and is very short and convincing.

█ The depositions and other documentary evidence, including the letters, are all before us, and this case is here to be tried *de novo. First State Bank of Binford v. Arneson,* 109 Wash. 346, 186 Pac. 889; *Herren v. Herren,* 118 Wash. 56, 203 Pac. 34; *Johnston v. Chesser,* 129 Wash. 580, 225 Pac. 442.

On the merits, therefore, we are convinced that the evidence clearly shows that Calvert undertook to reimburse appellant for its expenditures during the 1931 fruit season, which amounted to $2,768.55 over and above the proceeds for that season.

The judgment of the trial court is therefore reversed, and remanded with instructions to enter a judgment, in the above amount and for costs of the trial and appeal, to appellant, with interest at the legal rate from October 26, 1933, when the rejected claim was filed.

MILLARD, C. J., MAIN, BEALS, and BLAKE, JJ., concur.