[No. 28816.   Department One.   February 10, 1943.]

EDNA ELIZABETH CARTER, *as Executrix, Appellant,* v.
CURLEW CREAMERY COMPANY, INC., *et al.,*
*Respondents.*[1]

[1]Reported in 134 P. (2d) 66.

*Williams & Cooney,* for appellant.

*Wilmot W. Garvin,* and *R. W. Nuzum* (*Howard Frissell,* of counsel), for respondents.

478

Jeffers, J.—This action was brought by Ira Carter against Curlew Creamery Company, Inc., a corporation (hereinafter referred to as the corporation), John P. Helphrey, and John P. Helphrey, James M. Helphrey, and Frances M. Snook, partners, doing business as Curlew Creamery Company, to obtain a decree vacating the purported dissolution of the corporation, vacating the purported cancellation of plaintiff's stock in the corporation, requiring defendants to restore plaintiff's stock on the books of the company in plaintiff's name, canceling the purported transfer of the assets of the corporation to the partnership, requiring the restoration to the corporation of the property so attempted to be transferred, and demanding an accounting in favor of the corporation for all disposition made of any of the corporation's property by the partnership or any of its members, and such other relief as plaintiff may be entitled to.

While the action was pending, Ira Carter died, and Edna Elizabeth Carter, his widow, was appointed executrix of his estate and substituted as plaintiff in the action.

The second amended answer and cross-complaint of defendants admits and denies certain allegations of the amended complaint, and alleges affirmatively that, for many years prior to 1922, Ira Carter was manager of the corporation, and by virtue of his policies and acts of mismanagement the corporation became practically insolvent, and it was necessary that additional cash be put into the business to prevent involuntary dissolution; that, in consideration of John P. Helphrey's advancing additional funds, as requested by Carter, for the benefit of Ira Carter and the corporation, these two men, who at that time owned equally all the common and voting stock of the corporation, entered into a written agreement, on September 22,

1922, by virtue of which Ira Carter and the corporation were declared to be indebted to Helphrey in excess of six thousand dollars, and two hundred shares of stock owned by Carter were pledged to Helphrey as collateral for the payment of such debt; that the debt has never been paid, and the pledge is still in existence.

It is further alleged that, in conformity with the pledge agreement, Ira Carter delivered to Helphrey possession of the stock, and authorized Helphrey to vote the stock at any stockholders' or directors' meeting; that Carter was personally present at all such meetings from September 22, 1922, until in the year 1935, and John Helphrey voted the Carter stock at each and every one of such meetings; and that Ira Carter and the present plaintiff are now estopped to deny the authorization of Helphrey to vote the stock.

Defendants further alleged that, at the time of passing the resolution to dissolve, the corporation was indebted to Helphrey in the sum of $17,233.30; that Helphrey was the owner of 332 shares of the preferred stock, with delinquent dividends on the same in the sum of $19,068; and that Frances Snook was the owner of thirty-two shares of the preferred stock, all of such stock being of the par value of one hundred dollars a share and the delinquent dividend thereon.

By way of cross-complaint, defendant John Helphrey alleged that, by virtue of the advancements made, Ira Carter and the corporation are indebted to Helphrey in excess of six thousand dollars, and that it is necessary that the pledged stock be foreclosed, notice given, and a sale of Carter's stock had, the proceeds of such sale to be applied on such indebtedness.

The cause came on for trial before the court, which at the end of plaintiff's case sustained a challenge to the sufficiency of the evidence, and entered judgment

dismissing the action. From this judgment, plaintiff has appealed.

The theory of the trial court in this case is shown by the court's oral opinion, which states in part as follows:

"It is my opinion and judgment that this action was commenced by Mr. Carter for the purpose of testing the alleged dissolution of this corporation. The action was brought in behalf of the corporation and in behalf of all the stockholders for the benefit of the corporation. It is alleged that the dissolution was unlawful, illegal, and that the property distributed to the three beneficiaries was unlawfully distributed, and, in fact, the property is still the property of the corporation, and it is sought to have the property reinstated.

"Now, the private business dealings between Mr. Helphrey and Mr. Carter are not in issue in this litigation, that is, only incidentally in so far as it is necessary to investigate that transaction in order to determine whether the dissolution of this corporation was legal; in fact, an action involving their private affairs could not be joined with this action. The court has no power to determine their private rights in this kind of a proceeding and is not passing upon at this time the pledge or any of the rights of the parties growing out of the pledge.

"It is my opinion that the dissolution of this corporation was a valid dissolution and I need go no further in sustaining the motion to dismiss and challenge the sufficiency of the evidence. In doing so, I do not pass upon the validity of Mrs. Carter's rights to proceed against Mr. Helphrey as executrix or administratrix of this estate to bring into that estate any property rights which she claims or that she alleges the estate is being unlawfully deprived of by Mr. Helphrey. She can do that in a separate proceeding, but for this proceeding I think the challenge should be granted."

From the above statement and the judgment entered, which was a judgment of dismissal, reserving to the parties any rights arising out of the pledge agreement, it is apparent that the only question determined by

the court was that the dissolution of the corporation was a valid proceeding, and that is the main question for determination here.

Curlew Creamery Company was incorporated about 1906, for the purpose of engaging in the creamery business, with its place of business at Curlew, Washington. In 1914, John P. Helphrey and Ira Carter, who since about 1907 had been employed by Mr. Helphrey as a butter maker, became the owners of all the common stock of the corporation, each owning two hundred shares. In 1920, the corporation opened a plant at Chewelah, and in 1922 a plant was opened in Spokane. Since about 1925, the station at Curlew has been merely a cream station.

The corporate affairs, at least up to about 1929, when Frances Snook became connected with the company, were conducted by Mr. Carter and Mr. Helphrey as sole owners, with Mr. Carter being actively in charge of the business, Mr. Helphrey having a mercantile business of his own at Curlew which he was operating. Mr. Helphrey was president, and Mr. Carter vice-president, secretary, and treasurer of the company during these years. Mr. Helphrey seems to have been the one who advanced money when it was needed by the corporation, and in 1922 both Mr. Carter and the corporation had become indebted to Mr. Helphrey in a substantial sum for advances made to keep the corporation going.

On September 22, 1922, the written agreement above referred to was entered into between, Mr. Carter as first party, and Mr. Helphrey as second party. This contract recited the indebtedness owing by first party to second party, and that the corporation was in financial difficulty and must borrow money either from second party or upon the corporation's negotiable paper endorsed by second party. By the terms of this

agreement, first party assigned and pledged to second party his two hundred shares of the common stock. The contract further provided that the condition of the assignment and pledge was such that if Ira Carter should pay to second party the sum of $6,800, according to the terms of a promissory note executed by Carter and payable to Helphrey on or before September 22, 1924, with interest, and if Ira Carter or the corporation should pay to second party any and all sums which he had loaned or might thereafter advance to the corporation, and should save second party free and harmless of and from any loss, liability, or damage by reason of any and all endorsements he had made or might make for the benefit of the corporation upon its negotiable notes, bonds, bills of exchange, checks, or drafts, then the assignment and pledge should be null and void, otherwise to be and remain in full force and effect.

The contract contained no provision for the sale or other disposition of the pledged stock in the event of default in any of its terms.

Frances Snook, daughter of John P. Helphrey, became associated with the company in 1929, and thereafter, according to her testimony, attended all the meetings of the corporation, and had charge of the books. Mrs. Snook testified that, at all the meetings of the corporation held after she became associated with it, her father voted the Carter stock, without any objection on the part of Mr. Carter, he being present at the meetings.

While it has been a little difficult to determine just what part of the minute book of the corporation was admitted in evidence, as we understand it, the only part admitted was in regard to the dissolution proceedings, including the report of the trustee. However, Mrs. Snook, when examined relative to the minutes

of a meeting held September 24, 1935, testified that she thought Mr. Carter was present at that meeting, although she admitted he was not sent any formal notice of the meeting. When asked how it happened that at this meeting no reference was made to the Carter stock ownership, she answered, "We put it in by whoever votes it." Mrs. Snook was then interrogated in regard to the minutes of a meeting of March 15, 1936, which contained "a recitation about the resignation of Ira Carter as vice-president," and was asked if Mr. Carter was present at that meeting. She answered that Mr. Carter was not present, that he was given no notice of the meeting, and so far as she knew he did not know of the meeting. Mrs. Snook was also asked the following question:

"Q. Mrs. Snook, will you turn to the minutes to any place where it shows that your father voted Carter's stock unless it is this one of September 24, 1935? A. I don't know that I, as secretary, ever listed the vote of the stock."

Later, she was asked:

"Q. Now, will you turn to the minute book, please, showing any place where there is any record there of Mr. Helphrey voting Carter's stock? A. Well, I don't know that I ever wrote the list of who voted any of the stock, whether I noted mine, even. I know I voted my own. That is the only thing that I didn't put in the minute book as I wrote the minutes up as secretary. Q. And do your minutes show who was present at any of the meetings? A. I don't believe they do other than those mentioned in motions. I usually said just, 'A quorum being present,' and continued from there on."

Mrs. Snook further testified that the minutes of the meeting of September 24, 1935, were the only minutes she knew of which showed a list of who voted the stock, and that she did not know why she showed such a list in the minutes of that meeting.

Mr. Helphrey held no proxy from Mr. Carter to vote his stock, and no express authority so to do was shown, unless it was by virtue of the pledge agreement.

On January 22, 1936, Ira Carter wrote Mr. Helphrey a letter, which concludes as follows:

"I have now made arrangements to go into the wholesale ice cream and butter business and will be ready to start in a few days. As I have had several invitations from you to quit, I trust that this will meet with your entire approval."

It is the above statement to which respondents refer as a resignation of Mr. Carter and a recognition that he no longer had any interest in the corporation. There was also testimony of Mrs. Snook relative to purported conversations with Mr. Carter, which it is claimed by respondents further show that Mr. Carter did not claim any interest in the corporation. However, this witness testified that, beginning with 1936, Mr. Carter always claimed to be the owner of two hundred shares of stock.

Mrs. Snook testified that, after January, 1936, Mr. Carter did not attend the meetings of the corporation, and he was given no notice of meetings held after that time, at least no formal notice. From that time on, all the business of the corporation was conducted by John P. Helphrey, president, James M. Helphrey, vice-president, and Frances Snook, secretary-treasurer. During all this time, Mr. Helphrey seems to have recognized that Mr. Carter had an interest in the pledged stock. This appears from letters exchanged between Mr. Carter and Mr. Helphrey. The attitude of Mr. Helphrey in regard to the pledged stock is also shown by his testimony.

Mr. Helphrey was examined by Mr. Williams regarding a letter written by Helphrey to Carter under date January 23, 1936, in which Mr. Helphrey had stated:

"In the meantime carry in your mind that I would like to sell this plant and that if we can get a decent price for it you will have an equity in it. You know about what the liabilities of the plant are and how much it will have to bring for the common stock to have a value. In the meantime if anything comes up along this line I will feel free to consult you."

This letter was written after Mr. Carter had ceased to take any part in the management of the corporation.

In answer to a question relative to the above letter, Mr. Helphrey stated:

"What I actually say, 'In the meantime, if anything comes up along this line, I will feel free to consult you.' Well, I felt free any time if we could get a sale, because he [Carter] had this reversionary interest in this stock, if we could make it worth anything."

Mr. Williams continued his examination of the witness:

"Q. I understand, but at that time you were intending if the debts were paid so that if the condition ever got so that it could be done, that he [Carter] was to get half of the profits as well as yourself? A. At that time and at all subsequent times and previous times."

Mrs. Snook made out the income tax return for 1935, showing Mr. Carter vice-president and owning two hundred shares of common stock. She also made out the 1936 return, showing J. P. Helphrey as owner of three hundred seventy-five shares, and Ira Carter as vice-president, but owner of no stock. Mrs. Snook testified that she did not know why she made out the 1936 return as she did, as she had never been instructed so to do, but it was probably because Mr. Carter was not present in the business.

While it would seem, from the testimony of Mr. Helphrey, that he recognized a moral obligation to Mr. Carter, he did not recognize that Mr. Carter had any rights in regard to the stock, in so far, at least, as

voting it was concerned. Mr. Helphrey assumed that he could, and in fact he did, vote the Carter stock as though it belonged to him.

We now come to what in the minutes is termed as the stockholders' meeting of December 19, 1940, at which the following stockholders were present: Frances Snook, twenty-five shares; James M. Helphrey, one share; and John P. Helphrey, three hundred seventy-four shares. The minutes show that the above named stockholders asserted that they represented all the voting power of the shareholders of the corporation. A resolution was passed to dissolve the corporation out of court as of December 31, 1940, by the method of voluntary dissolution, under Rem. Rev. Stat. (Sup.), § 3803-49 [P. C. § 4503-149]. Frances Snook was elected trustee to wind up the affairs of the corporation. Acknowledged copies of the resolution were filed of record in the office of the secretary of state, and in the office of the auditor of Stevens county. It does not appear that Mr. Carter had any notice of this meeting, or took any part in it.

On December 31, 1940, Frances Snook made a report as trustee, and distributed the assets of the corporation to the following stockholders: John P. Helphrey, five-eighths; James M. Helphrey, one-eighth; Frances Snook, two-eighths. In the report, it is stated that the three persons last above named have assumed, jointly and severally, the liabilities of the corporation.

While it is our opinion that Mr. Carter thought he might ultimately obtain something from his stock if the indebtedness recognized by the pledge agreement was paid, we are, however, further of the opinion that he is now estopped from claiming that Helphrey did not have implied authority to vote his stock, both for the purpose of conducting the ordinary affairs of the corporation and for the purpose of dissolution.

While it is true the minutes do not show just who voted the stock, there is positive testimony by Mrs. Snook that, at all the meetings of the corporation after 1929, her father voted the Carter stock; that, up until the latter part of 1935, Mr. Carter was present at these meetings, and made no objection to Mr. Helphrey's voting his stock.

We may say here that the record does not indicate that Mr. Helphrey or Mrs. Snook intended in any manner or by anything they did to defraud Mr. Carter. In fact, Mr. Carter received a salary up to 1936, although it appears that he performed but little services, at least for the last part of 1935. The letters from Mr. Helphrey to Mr. Carter do not indicate that Mr. Helphrey ever had any idea other than that, if the corporation paid out, Mr. Carter's stock might have some value, but neither Mr. Helphrey nor Mrs. Snook recognized or believed that Carter had any financial interest in the corporation, or any rights in so far as voting the stock was concerned.

We recognize that Mr. Helphrey received and held the Carter stock as pledgee. We also recognize the rights of a pledgor and pledgee, in regard to voting pledged stock, where no express authority is given to the pledgee to vote the stock, and where the stock has not been transferred to the pledgee on the books of the company, under Rem. Rev. Stat. (Sup.), § 3803-28 [P. C. § 4592-58]. However, it seems to us that Mr. Carter by his acts so plainly indicated that he recognized the right of Mr. Helphrey to vote his stock, and so plainly indicated after January, 1936, that he (Carter) did not claim any right in so far as the policy or the conduct of the business was concerned, that he is now estopped from claiming that the dissolution of the corporation was invalid.

There were two statements made by Mrs. Snook, while being examined by counsel for respondents, to

which appellant objected. The court, however, permitted her to answer, and error is assigned on the admission of this testimony. Appellant contends that Mrs. Snook was incompetent to testify, by reason of Rem. Rev. Stat., § 1211 [P. C. § 7722], the dead man's statute.

An oral examination of Mrs. Snook was conducted by appellant prior to the trial, under rule VII, Rules of Practice, 193 Wash. 44-a. However, it does not appear from the record that in that examination Mrs. Snook was asked any questions pertaining to transactions or conversations had with Mr. Carter.

Mrs. Snook was called by appellant as an adverse witness. During this examination Mrs. Snook was asked: "Is this [referring to the minute book] the one place that you say your father voted his [Carter's] stock?" to which she answered:

"My father has voted his stock continuously at every meeting that I have been present at since 1929 in Mr. Carter's presence. As secretary-treasurer, the first thing I did was call for stock represented, and at every meeting my father voted Mr. Carter's stock and Mr. Carter made no objection."

While the last part of this answer was perhaps a volunteer statement, appellant did not move to strike it or in any way call the court's attention to Mrs. Snook's incompetency.

Thereafter, Mrs. Snook was examined by counsel for respondents in reference to Mr. Helphrey's voting Mr. Carter's stock, and she answered: "Never at any time did he [Carter] object to it." She further testified, in answer to whether Mr. Carter had ever, in her presence, told the employees of the company that he had no interest in the company: "Yes, I have heard him say that he had no interest." These are the two statements to which appellant objected.

■ Appellant, under proper circumstances, had the right to invoke the statute, as the litigation here fell within the terms of the statute. We believe Mrs. Snook was an "interested party," within the meaning of the statute, for not only was she a stockholder of the corporation, which alone would disqualify her (*Conlan v. Spokane Hardware Co.,* 117 Wash. 378, 201 Pac. 26; *Parks v. Sterling Box Machine Co.,* 186 Wash. 269, 57 P. (2d) 1032; note, 27 L. R. A. (N.S.) 816; 3 Jones on Evidence (4th ed.) 1449, § 789), but she also has an interest in the partnership which may be materially affected by the determination of the executor's right to question the dissolution proceedings. She is also a party to the record.

■ It is apparent that, in both instances above mentioned, Mrs. Snook was testifying to a transaction with the deceased. Undoubtedly then, unless the statute has been waived by appellant, error was committed by the admission of this testimony. In regard to the first statement made by Mrs. Snook, we are of the opinion appellant has no ground upon which to base an objection, in view of the answer made by Mrs. Snook in response to a previous question asked by appellant. However, the second statement relative to Mr. Carter's claiming no interest in the company, was first brought out by respondents.

Respondents contend that appellant waived her right to object by taking the pre-trial interrogatories, by calling Mrs. Snook as an adverse witness, and finally by examining the parties relative to statements and transactions with the deceased.

■ In support of their contention that appellant, by her oral examination of Mrs. Snook prior to trial, waived her right to object to this testimony, respondents cite the case of *American Fruit Growers v. Calvert,* 186 Wash. 29, 56 P. (2d) 1307. In the cited case, it ap-

pears that, in a deposition before trial, the respondent, who was relying on the protection of the statute, examined witnesses as to particular transactions with the deceased. The appellant, the adverse party, then attempted, at the time of trial, to examine these same witnesses relative to the same transactions. Under that factual situation, the court held that the benefit of the statute had been waived by the respondent. This is in accord with the general rule that, if a deposition is taken as to a particular transaction, the incompetency of the witness is waived as to all pertinent facts relative to that transaction. 64 A. L. R. 1148, 1164; 107 A. L. R. 482, 490.

In the instant case, there is no showing as to what matters were covered in the oral questioning before trial. If the questions involved only such matters as Mrs. Snook was competent to testify to under the statute, there would be no waiver.

Nor do we believe that the fact that appellant called Mrs. Snook as an adverse witness in itself constitutes a waiver. The party benefited by the statute may call an adverse party to testify, and unless there is an attempt to examine into matters relative to transactions with the deceased, there is no waiver. *Conner v. Hodgdon,* 120 Wash. 426, 207 Pac. 675; 64 A. L. R. 1148, 1155; 107 A. L. R. 482, 485; 28 R. C. L. 515, § 102.

It may be conceded that appellant did introduce certain testimony relative to transactions and conversations with the deceased, and, as to those transactions first developed by appellant, the benefit of the statute was waived, and respondents had the right to introduce evidence relative to those transactions and all other circumstances necessary to explain them. But, although the statute may have been waived as to those particular transactions opened up by appellant, the waiver does not extend to unrelated transactions

and conversations. *Kraft v. Security State Bank*, 54 S. D. 325, 223 N. W. 208; *Wilkins v. Skoglund*, 127 Neb. 589, 256 N. W. 31; *Nolty's Adm'r v. Fultz*, 261 Ky. 516, 88 S. W. (2d) 35.

While there are some jurisdictions which apparently recognize the possibility of a complete waiver once the adverse party is called to testify, we believe that such a rule is dependent upon the peculiar statutes of those states, and is not applicable to our own. *Stream v. Barnard*, 120 Ohio St. 206, 165 N. E. 727, 64 A. L. R. 1144; *Deacon v. Bryans*, 88 Cal. App. 322, 263 Pac. 371.

We are of the opinion that the conversation testified to by Mrs. Snook, in which she stated that Carter denied any interest in the company, was a separate and distinct conversation, not sufficiently connected with the transactions developed by appellant to be admissible.

■ However, there is other conduct on the part of Carter which we feel furnishes the basis for an estoppel.

"Estoppel by misrepresentation, or equitable estoppel, is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy. This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. It consists in holding for truth a representation acted upon, when the person

who made it, or his privies, seek to deny its truth, and to deprive the party who has acted upon it of the benefit obtained. When a party unjustly contrives to put another in a dilemma and to subject him to necessity and distress and he acts one way, it is not for the wrongdoer to insist that he should have acted another way." 21 C. J. 1113, § 116.

See, also, *Strand v. State, ante* p. 107, 132 P. (2d) 1011, where the above rule is quoted with approval.

■ From the beginning of 1936, up to the date of dissolution, Carter took no active part in the business. Except for his request for a financial statement, it appears that he took no interest whatsoever in the affairs of the company, nor in the policies adopted by Mr. Helphrey. He became interested in a competing ice cream business. He bought merchandise from the corporation for the new company in which he was interested, and, as testified by Mrs. Snook, called at the office of the corporation several times a month. Mrs. Snook, when examined by counsel for respondents, testified that on one of these visits she informed Mr. Carter that they were considering the possibility of dissolving the corporation and forming a partnership, and that in this conversation with Mr. Carter she stated to him:

" 'Father and I have been discussing the possibility and the advantages that might be accrued from a voluntary dissolution of the corporation and operation as a co-partnership.' And he said, 'What do you think you will save?' And I said that I was sure that we could save the corporation income tax, the capital stock tax, the corporation license; and he said, 'What do you think that will amount to?' And I told him, oh, I was sure between three and four hundred dollars a month—or a year. And he said, 'Ten years, that would be three thousand, that would be quite a saving,' he said, 'Well, I don't blame you if you do that.' In fact, he made it quite plain that he thought it would be a good idea."

No objection was made to this testimony. When Mrs. Snook was thereafter called by appellant, she again stated that Mr. Carter had said there would be considerable advantage in forming a partnership, and he did not claim any interest in the corporation at that time, or any future interest should there be a partnership.

Again, on recross-examination of Mrs. Snook by Mr. Williams, she was asked:

"Q. When you spoke about your talk with Mr. Carter yesterday about the wisdom probably of changing to a partnership, were the terms of the organization of the partnership discussed? A. Yes. Q. As to how the stock would be divided? A. Not how it would be divided. Q. That the interest would be divided? A. That the interest would be divided between my father, my brother and myself. He knew that. Q. And when was that discussed? A. It was during the summer of 1940. I can't give you the date. Q. Yes. Was there any agreement at that time about the division? A. You mean between the three of us? Q. No between Mr. Carter and you. A. There was never any question of the agreement. He didn't ask for any interest. He didn't indicate that he wanted any—that he had any."

If Mr. Carter is not estopped by his actions in this case, it is difficult to see how there could be an estoppel. His conduct in permitting Mr. Helphrey to vote his stock through the years, his withdrawal from any active participation in the business and becoming actively engaged in a competing business, his failure to assert any rights at the time of the discussion of dissolution and the prospective formation of a partnership, all clearly indicate to us that Mr. Carter did not believe that he at that time had any financial interest in the corporation. He permitted respondents to proceed with the operation of the corporation as they deemed best, and we are firmly convinced that the

Helphreys were justified in concluding that Mr. Carter had impliedly consented to any action on their part they believed to be for the best interest of all the stockholders of the corporation. The relationship between Carter, the corporation, and Helphrey was not the normal stockholders' relationship. Therefore, while the evidence in this case might not in all circumstances be sufficient to estop a shareholder from questioning a dissolution, we are clearly of the opinion that it does in this case.

While we do not believe the Helphreys were justified in concluding that Carter had renounced all ultimate financial interest in the business, we are satisfied they were justified in assuming that Carter had given to Mr. Helphrey blanket authority to proceed in any manner he saw fit to protect and preserve the the interests of both parties, whatever they may have been. Therefore, when Helphrey determined that a partnership organization would be advisable, as long as he acted in good faith, he had authority to vote Carter's stock for a dissolution of the corporation.

However, we again say that, while we feel that Carter consented to Helphrey's conducting the business in any manner he saw fit, we do not believe that Carter intended to completely abandon his entire investment in the company. Recognizing that Helphrey had superior rights, due to his large loans to the company, and realizing how difficult it would be to ever reclaim the pledged property, Carter apparently was willing to turn the whole business over to the pledgee to manage. But under the evidence here developed, and as admitted by respondents Helphrey and Mrs. Snook, Carter still assumed that eventually he would have some right or interest in the property, when and if the pledge agreement was satisfied.

The right which Carter had then, and the right

which the executrix now possesses, is not to question the validity of the dissolution, but rather to determine what, if any, rights Carter, as pledgor, had in the assets of the corporation at the time of dissolution, or has in any property of the corporation that may have been distributed to Mr. Helphrey or the other partners at the time of dissolution, and this right we think the executrix would have until such time as Mr. Helphrey had obtained legal title to the Carter stock.

■ In view of the fact that the trial court was of the opinion that it was without jurisdiction to pass upon the rights of the parties under the pledge agreement, and without jurisdiction to determine any question other than the validity of the dissolution, we are of the opinion the judgment must be modified and remanded to the trial court for further proceedings, and in this connection we are satisfied that the trial court had jurisdiction to hear and determine the rights of all parties to the action properly raised by the pleadings.

It seems to us that a court of equity, having assumed jurisdiction of this case for one purpose, had the power to hear and determine not only the matter of dissolution, but all the rights of the parties incident thereto. 19 Am. Jur. 281, § 409. In *McKay v. Calderwood*, 37 Wash. 194, 79 Pac. 629, we stated:

"We have frequently decided, in principle, that, under the provisions of the code, litigants cannot be expelled from the court at one door under the burden of accumulated costs, with the admonition to enter the court at another door with another accumulation of costs; but that, whatever rights the plaintiff has under the complaint, conceding its allegations to be true, will be tried out by the court, and the proper judgment in the cause rendered."

See, also, *Lawrence v. Halverson*, 41 Wash. 534, 83 Pac. 889.

While this appeal was pending, application was made by appellant that she be added as a plaintiff-appellant in her individual capacity, by reason of the fact that the two hundred shares of Carter stock here involved had, since the trial of the action, been set aside to her as the surviving widow of Ira Carter, deceased. This motion was passed to the merits. Upon the showing made, and under Rem. Rev. Stat., § 193 [P. C. § 8274], we are of the opinion that Edna Elizabeth Carter should be added as a party plaintiff and appellant, and we have so considered her on this appeal. By granting this motion, we do not mean that we are holding that Mrs. Carter as an individual is ultimately entitled to any other or different relief than she is as executrix, but that she is bound by this decree in so far as the dissolution proceedings are concerned. The motion is granted for the further reason that the court may have all these parties before it when it proceeds with this case.

The judgment of the trial court is affirmed, in so far as the validity of the dissolution proceedings is concerned, and modified to the extent that the court proceed to hear and determine the rights of appellant as executrix, and the rights of Edna Elizabeth Carter, individually, if any they have, under the amended complaint, and the rights of respondents, if any they have, under their second amended answer and cross-complaint, consistent with this opinion. Neither party will recover costs in this court.

MILLARD, STEINERT, ROBINSON, and MALLERY, JJ., concur.