[No. 16498.   Department Two.   December 19, 1921.]

ELMA S. HERREN, *as Administratrix etc., et al.,*
*Respondents,* v. S. L. HERREN, *as*
*Administrator etc., et al.,*
*Appellants.*[1]

APPEAL (452)—REVIEW—HARMLESS ERROR NOT AFFECTING TRIAL
DE NOVO.   On trial *de novo,* the supreme court will consider evidence
erroneously excluded and disregard evidence erroneously admitted.

TRUSTS (19)—RESULTING TRUST—EVIDENCE—SUFFICIENCY.   Where
one brother took title to farming property in his own name, no re-
sulting trust in favor of another brother to an undivided half in-
terest was created, where there was no evidence of the latter's
having furnished one-half of the purchase money from his own
funds or property.

SPECIFIC PERFORMANCE (16-1, 17)—CONTRACTS ENFORCEABLE—ORAL
AGREEMENT TO CONVEY LAND—POSSESSION AS PART PERFORMANCE.
Part performance of an oral contract to convey land is not estab-
lished by evidence that a son had been given possession of the
property, merely from the fact that such son had remained on the
property with his parents and worked it since majority, since that
would constitute no change of possession, constructive or other-
wise.

FRAUDS, STATUTE OF (42)—SPECIFIC PERFORMANCE (51)—ORAL
AGREEMENT TO CONVEY LAND—EVIDENCE—SUFFICIENCY.   An oral agree-
ment to convey land, partly performed, need not be shown by proof
that removes all uncertainty, but it is sufficient if, from the whole
evidence, even if conflicting, the contract can be determined with
reasonable certainty.

HUSBAND AND WIFE (64, 67)—COMMUNITY PROPERTY—CONVEYANCE
OR SALE BY HUSBAND.   An oral promise by one spouse to convey

[1]Reported in 203 Pac. 34.

property cannot be enforced against the other spouse who did not join therein.

SPECIFIC PERFORMANCE (24-1, 28)—GIFTS—ORAL PROMISE TO CONVEY LAND—PERFORMANCE BY PLAINTIFF — EVIDENCE — SUFFICIENCY. Where a father had deeded one of his sons an undivided one-half interest in the home farm, which was community property, in which deed the mother admits she would have been willing to join had she been requested, and the evidence shows the son had worked and managed the place since attaining majority with that understanding, sufficient is shown to uphold the claim of a parol agreement for the conveyance of a one-half interest to him.

COSTS (62)—ON APPEAL—MORE FAVORABLE JUDGMENT. Costs of appeal are allowable to appellants who recover substantial benefits by their appeal.

Appeal from a judgment of the superior court for Lewis county, Reynolds, J., entered December 29, 1920, upon findings in favor of the plaintiffs, in consolidated actions for equitable relief, tried to the court. Modified.

*S. C. Herren* and *H. E. Donohoe,* for appellants.

*Chas. M. Fouts* and *C. B. W. Raymond,* for respondents.

HOLCOMB, J.—A. J. Herren died intestate February 16, 1920, in Lewis county, leaving surviving him his widow, Jane Herren, and their children, Hugh Herren, Susie Herren and E. Benjamin Herren, as his only heirs at law. On June 28, 1920, E. Benjamin Herren died intestate in Lewis county, Washington, leaving surviving him his widow, Elma S. Herren, and their minor son, Robert D. Herren, as his only heirs. On July 22, 1920, Elma S. Herren was appointed administratrix of the estate of E. B. Herren, and also was appointed general guardian of their minor son, Robert D. Herren, and qualified in each of those capacities. In August, 1920, Samuel L. Herren was appointed administrator of the estate of A. J. Herren, deceased, the widow having waived her right.

This appeal is from a decree in two consolidated actions. One was an action of Elma S. Herren, in her own right and as administratrix, and as general guardian of Robert D. Herren, a minor, against the appellants, claiming, through her deceased husband, ownership of 308 acres of land, described as the Herren home place, comprising what was originally the Morgan donation land claim, and a part of the Bouchard donation land claim; and alleging in effect that appellants were the holders or owners of bare legal title, and have refused to transfer the same to her deceased husband or his successors in interest. Subsequent to the commencement of the foregoing action, appellants instituted an action against respondents, claiming ownership of all the property that had been inventoried by respondents and filed in the records in the estate of E. B. Herren, deceased, particularly describing the property, both real and personal, as it appeared in the inventory of E. B. Herren, deceased.

In their action for specific performance, respondents alleged that there was an oral agreement made and entered into between E. B. Herren and his father, A. J. Herren, in effect as follows:

"That in consideration of the services rendered by E. B. Herren in liquidating several thousand dollars of indebtedness incurred by A. J. Herren, for which said premises were bound, and in further consideration that the said E. B. Herren will continue to reside upon said premises, orally agreed to convey the whole of said premises to E. B. Herren by a good and valid deed of conveyance, with the understanding that the said A. J. Herren and wife could, during their lives, occupy the residence upon said premises, and did then place said E. B. Herren in possession of the whole of said premises, which possession he retained to the time of his death, and that no time was specified for the execution of said deed, but it was understood by the

parties making said oral agreement that the said A. J. Herren and Jane Herren, upon demand would each, by a valid deed, convey an undivided one-half interest in said premises to said E. B. Herren. That said oral agreement was negotiated by said A. J. Herren, and that the said Jane Herren agreed to abide by what her husband did, and ratified, at all times up to the death of said E. B. Herren, the said agreement, and recognized the existence of said agreement as their valid obligation."

The complaint further alleges that E. B. Herren, relying upon that agreement, took possession of the premises, and thereafter spent many thousands of dollars in clearing, fencing and repairing buildings and preparing the premises for suitable cultivation and occupancy, and otherwise improving the property, and in the paying of taxes and defraying of other expenses, all of which was done with the knowledge and consent of A. J. Herren, and that E. B. Herren exercised the right of ownership of the premises; and that, on or about September 6, 1919, the parties interested made a division of all the real estate, and, among other transactions, A. J. Herren made, executed and delivered, by and with the consent of his wife, Jane Herren, a deed of an undivided one-half interest in and to all the home place involved.

The defendants answered the complaint of respondents and set up a general and specific denial of all the material matters set out in the complaint; and by way of affirmative defense, allege that the property described in respondents' complaint was at all times the community property of A. J. Herren and Jane Herren, his wife; that they lived and resided upon the place for upwards of thirty years, paid all the taxes, and that no one questioned their ownership or possession; that A. J. Herren died intestate on February 17, 1920; that the widow, Jane Herren, according to the law of de-

scent, is the owner of an undivided one-half, with all her homestead rights in the whole of the estate; that the children and heirs, according to the laws of descent, were the owners in fee of the other undivided one-half, and that the widow, Jane Herren, and the heirs and administrator of the estate of A. J. Herren are now in possession of all of the property described. They further affirmatively allege that A. J. Herren and wife lived on the property for many years with their children, and cultivated the same; that the son Ben Herren was permitted to handle the funds and manage the place merely as a son and not otherwise; that they worked together and were prosperous, without any understanding or agreement as to the division of the property or the proceeds of the same; that the title was at all times held by A. J. Herren and wife; that there was no contract to convey, as alleged in the complaint; that all the money Ben ever had or made was made there on the home place, and that the family living there helped him to do it; that all improvements and taxes were paid for out of the joint efforts, from the property on the place, all working together.

They further allege that the deed attempted to be procured by E. B. Herren from A. J. Herren of an undivided one-half interest in the Herren home place was procured at a time when A. J. Herren was without sufficient mental capacity or understanding to make or deliver a deed; that he did not know what he was doing, by reason of his extreme illness, and that the deed mentioned in the complaint was void under the statute, in that it was not joined in by the wife of A. J. Herren, the property being community property.

It is further alleged that the oral agreement alleged by respondents to convey was void, not having been in writing and relating to real property.

These several affirmative matters were put in issue by appropriate denials.

The trial court made findings in favor of respondents, decreeing specific performance of the alleged oral contract to convey the 308 acres of land, and finding that the personal property upon the farm, consisting of stock, machinery and implements, was the property of the estate of E. B. Herren, and that the $3,000 in United States liberty loan bonds, which had been purchased by E. B. Herren, was the property of his estate, and that the $9,000 worth of United States liberty loan bonds, and some $6,000 worth of municipal and county bonds, were the property of the estate of A. J. Herren, deceased.

Forty-one errors are claimed by appellants, some of which are well taken, but we shall not discuss them all separately. Among other things, the court made some findings which there is absolutely no evidence to support, and we presume were made by inadvertence at the request of prevailing counsel. The court, also, in summing up the evidence, appears to have made several incorrect statements, due, no doubt, to lapse of memory after the conclusion of a very lengthy and complicated trial. We shall, however, consider all evidence which is here which should have been admitted, and disregard any which should have been rejected by the trial court, since we must try the case *de novo* upon the whole record.

Prior to the year 1887, A. J. Herren purchased the 308 acres of land in controversy. In that year he moved upon the property with his family, consisting of his wife and six children—five sons and one daughter—the sons' names being Harry, Hugh, Ben (or E. B.), Samuel (or S. L.), and Judson, and one daughter, Susie. The family, with the exception of those who

have since died, namely, A. J. Herren, the father, Harry, Judson and Ben, with the exception of Hugh, who lives in Puyallup, are still living upon the property. The daughter remained unmarried, and has resided with her parents all her life, and was about forty-one years old at the time of the death of her father. E. B., or Ben, was forty-six years old at the time of his death, and had lived upon the premises in controversy ever since his thirteenth year. During the years from 1888 to 1894 or 1895, A. J. Herren engaged in conducting a mercantile business and a saw mill in the town of Toledo, Washington, with his eldest son, Harry. During this time he mortgaged the home place for an amount not disclosed by the records in this case, and during the financial stringency of the early 90's he was unable to pay the indebtedness, and the mortgage was foreclosed. The financial stringency also caused him to close up his mercantile business and his milling and logging business at Toledo. His eldest son, Harry, moved away to Idaho, and the next son, Hugh, became manager and took charge of the farm.

When the sale took place under the mortgage foreclosure in 1895, the father, rightfully taking advantage of the statutes regarding possession of the farming lands during the period of redemption from sale, leased the home place to Hugh for the year of redemption, at the time advising Hugh that this was done so that the crops then growing on the place during the period of redemption might be secured. He also sold the saw mill which they had owned for about $2,000, and turned the money received from the sale over to Hugh to be used in working the home place and in the purchase of stock and implements necessary to operate the same. During this period the father took his two younger

children, Susie and Judson, to Seattle to attend school
for two or three years, leaving his wife and the other
boys, Hugh, Ben and Sam, on the home place. Ben
had then just come of age. Hugh took possession under
the lease and worked the place, but did not succeed in
redeeming it at the end of the year, and subsequently
took another lease from the purchasers at the fore-
closure sale, through their agent, and continued in
possession under that lease until he repurchased the
entire property in his own name from the owners.
Hugh ultimately paid off the entire indebtedness, and
in so doing used about $1,600 of money received from
the sale of hops which he grew during three years at
Puyallup, and in connection with the proceeds of the
farm. In April, 1900, he and his wife redeeded the
property to A. J. Herren, and left it. Hugh worked
upon the place until he was thirty years of age. Dur-
ing that time all the other members of the family, in-
cluding the mother and Ben, and excepting Harry, the
eldest son, and Judson, the youngest son, and Susie,
also worked upon the place. When Hugh left the place,
he and Ben started a butcher business in Puyallup in
partnership, under the name of Herren Brothers. The
stock raised and fattened on the farm was shipped to
Hugh in Puyallup and sold.

After the property had been repurchased, and after
Hugh left, Ben became his father's superintendent and
chief man on the place and took the active management
and control of it, by and with his father's consent, and
directed practically all of the business in regard to the
operation of the farm. The father and mother, and
for some time the brother Sam, and the daughter, also
remained upon the place and worked thereon. The
father aided, assisted and advised Ben in the control
and management of the place, mended implements and

machinery and fences, assisted in taking care of a number of milch cows, and feeding and taking care of the stock. The mother and Susie, the daughter, cooked the meals for the family and hired help, raised chickens and other fowls, and almost supplied the home with groceries from the sale of eggs and the like. The daughter assisted in milking the cows and in marketing the cream, and also taught school for three years, and turned over a part of her salary to her brother Ben to be used by him as he saw fit. She also performed the usual chores that are to be performed upon a farm. The son Sam (or S. L.) assisted in repairing and keeping up the machinery and in general chores about the farm. Harry, the eldest son, who went to Idaho, took up a timber claim, and later died. Having no wife or children, his parents were his sole heirs at law. They afterwards sold the timber claim in 1906, and the net proceeds amounted to $12,650. That money was used by A. J. Herren. Three thousand nine hundred dollars of it was invested in an eighty-acre tract for the daughter. A portion of the balance seems to have been used in the purchase of municipal bonds, and later of liberty bonds. After Hugh left the place and Ben took the management, he was given as much authority about the place as his father had himself. The banker with whom they did business testified that the father came to his bank with Ben and instructed him as follows:

" 'Ben looks after all my business and whenever he wants to make out any checks it is all right with me. Whatever he does is all right with me.' We were authorized to pay any checks drawn by E. B. Herren."

The checking account of the father averaged, ordinarily, about ten times that of Ben, he stated.

Ben retained the management of the place for twenty-five years, until his death. During all that time

he lived with his parents, except the last two years when he built another house on the land near the home of his parents and went there to live with his wife and child. He was not married until about nine years before his death. Hugh testified that, when he left the place in 1900 to go to Puyallup, he had $20 and Ben had less. The facts all show that Ben was an exceedingly active, energetic and capable man, and that his sense of filial duty towards his parents was strong. In fact, the unity and concord shown between the parents and children, and between the children themselves, is much more manifest than the ties of consanguinity often display. They worked together and they accumulated a large amount of valuable property. Those remaining at home with the parents seem to have considered almost everything in common. Ben improved and used Susie's land as if it were his own, and used all the property of the home place as if it were his own, and this with entire good faith on his part and good will on the part of the rest.

About September 6, 1919, A. J. Herren was extremely ill and expected to die, and at that time Ben called on Bran, president of the Toledo Bank, to come to his home. Ben told him that his father was not very well, and he wanted to dispose of his property so it would not have to go into court in case he died. Four deeds were made; one to a piece of North Carolina land, not disclosing to whom it was made, but possibly to perfect some old title; another to Hugh Herren for a forty-one acre tract that lay outside of the 308 acres; another to Sam for a tract known as the "Worthington Tract," of about 108 acres, part of which was valueless; and another to Ben of *an undivided one-half of the* 308 *acre* home place. All these deeds were made at the instance of Ben. All of them were acknowledged

3—118 WASH.

by A. J. Herren before Bran as a notary public. All of them were signed and acknowledged by Jane Herren before the notary public, except the deed to the half interest in the home place. She was not asked to sign that. She testified at the trial that, if she had been asked, she would probably have been willing to sign the deed *to the half interest in the home place.* There is some conflict as to the extent to which the other children participated in the transactions of September 6, but it is certain that they and Mrs. A. J., or Jane, Herren, knew about them.

There is no evidence that Ben Herren contributed anything to improve the place after he was put in active control of it, except what he obtained from the property and the proceeds of his labor upon the place. There is no evidence that there was any agreement as to the division of the proceeds at any time. The farm and the proceeds thereof and the acquisitions of all of them seem to have been considered mere common funds by all of them. They let Ben take what he pleased, and while he did not attempt to override his father and mother, or the rest of them, he became prosperous by his use of the place and its proceeds. The stock and implements that were upon the place when he took control were stock and implements that had been acquired by Hugh during his management, from the proceeds of the $2,000 which had been turned over to him, and the proceeds of the farm. Afterwards, through his accumulations from the moneys which he was allowed to retain willingly by the other members of the family, Ben became fairly prosperous, and during the war bought $3,000 worth of bonds, and purchased the forty acres deeded to Hugh on September 6, 1919, for $3,000, paying $1,500 in cash and borrowing the balance from his mother.

There is no evidence whatever of an agreement to convey the entire home place to Ben by his father and mother; and it is beyond dispute that the home place became community property when it was reconveyed to A. J. Herren by Hugh. While it is insisted that no consideration was paid therefor at the time Hugh reconveyed to his father, Hugh admits that he afterwards received enough money from his father to repay him for all that he paid out for the repurchase of the place, over and above what he received from his father to start with.

It is insisted that, when Hugh took title to the property in his own name, a resulting trust was created instanter in favor of his brother Ben for an undivided one-half interest therein, because his brother Ben had furnished one-half of the purchase money to purchase the property. There is absolutely no evidence that Ben had earned one-half of the purchase money, or any definite amount. All the evidence there is is that Ben worked upon the place with Hugh, while Hugh was managing it, and that he went into partnership with Hugh in the butcher business for about three years from 1900, and that they paid part of the purchase price which was paid to repurchase the place from funds derived from the partnership in the butcher business. How much was not shown. It is shown that Hugh paid $1,600 of the funds to repurchase the place from moneys he earned in raising hops at Puyallup, in which Ben had no interest whatever. The only evidence of any right of Ben's to the conveyance of the place is that of two witnesses who had been hired hands upon the place, who testified in one case that the father told him that if he had his way Ben was to have the place; in the other instance, that Ben was to have the place. Neither one testified that the old gentleman told

either of them that he had contracted to convey the place to Ben. No witness testifies as to anything that Ben was to do to earn the conveyance of the place from his parents, or exactly what he should do for his parents. They lived with him and he lived with them, but whether one furnished more support to the other than he received does not appear. No witnesses testify that the mother ever made any agreement to convey the entire property to Ben, and she testified positively that she did not; that she knew of no agreement to convey the place to Ben. She insisted that she had all her community rights in the home place, and in all the stock and machinery thereon. Respondent's contention that a resulting trust for at least a half interest in the home place existed in favor of Ben cannot be sustained. In fact there is no aliquot part of an interest in the home place that can be shown by any definite contribution from Ben of his own funds or property which would result in a trust in his favor: *Croup v. DeMoss*, 78 Wash. 128, 138 Pac. 671.

Respondents contend, also, that giving Ben possession of the home place and allowing him to continue in possession for a long period of time was such a part performance as would entitle him to specific performance.

There was absolutely no change of possession, constructive or otherwise. Ben had been living with his parents since majority, and he remained. They occupied all things in common. Even Samuel, who lived on an adjoining tract of ten acres, built a store on the 308 acre tract, near his residence, about eighteen years before 1920, which building was worth about $1,000, and which still remains on the land, and did business from the store for a number of years. He discontinued it during war times. He also pastured, in common

with the rest of the family, about 100 acres of the home place. He also cultivated a small portion of it for a time and received the proceeds and retained them without accounting. He built the store building on the land with his parents' consent, and they furnished him part of the money, and Ben, while it was being erected upon the land, and afterwards, made no objection. Ben's possession of the home place is no stronger or different than that of Susie, his sister, who also resided thereon, in the same house, continuously, with the exception of the two or three years she was in school in Seattle. The only difference between Ben and the others is that, as heretofore stated, his father gave him the management and control of the place in his place and stead. The land continued to be taxed during all these years in the name of the father, as well as the personal property. In fact, no change of any kind was made that would show that Ben possessed the premises in any different capacity than he had during his minority, or did up to the time Hugh left.

We do not agree with appellants' contention that an oral agreement to convey land must be shown by proof that removes all uncertainty. It is sufficient if, from the whole evidence in the case, the contract can be determined with reasonable certainty. It is the duty of the court to ascertain, if it can, what the terms of the contract were, although the evidence may be somewhat conflicting. *Mudgett v. Clay,* 5 Wash. 103, 31 Pac. 424; *Coleman v. Larson,* 49 Wash. 321, 95 Pac. 262; *Velikanje v. Dickman,* 98 Wash. 584, 168 Pac. 465.

But, as said in the last cited case, every case of this character essentially rests upon its own facts. In this case, there are no such facts as existed in the *Velikanje* case. In that case there were declarations by the al-

leged oral grantor to third persons, which, construed in the light of all the circumstances, proved by inference that the contract had been made, though the grantee's lips were sealed by the statute because the grantor's lips were sealed by death.

That is true also in this case; but in this case the alleged grantor had never made any admissions or declarations to third persons that he had made an agreement to convey the place to Ben. And since it was community property, as alleged by respondents and admitted by them at the trial, and, as we hold, conclusively shown by the evidence, he could not convey or incumber the property without being joined therein by his wife.

There is evidence, however, both by act and inference, that it had been agreed that Ben was to have half of the home place, or an undivided one-half interest. Exactly what is not known, except as shown by the deed of September 6, by which the father, at Ben's own request, conveyed an *undivided one-half interest* to Ben. These circumstances tend to prove that Ben did not have an agreement for the entire place, or expect a conveyance of the entire place. When both were alive, Ben asked his father for what had either been agreed upon by them or was considered his right. He did not ask his mother to join in the deed of the half interest of the home place, although he asked her to join in every other deed that was executed at that time. He might have thought that an undivided one-half interest could be conveyed by his father without his mother joining; and his mother testified that she might have been willing, had she been so requested, to join in a deed to Ben of an undivided one-half interest; and since she made this admission, we are inclined to believe that she must have understood, during all those

years that Ben worked and managed the place, that he was to get a half interest, or one-half of the place. We believe that, as to the one-half interest in the home place, the evidence brings this case within the rule that a parol agreement for the conveyance of real property will be enforced where it has been fully performed by the promisee. *Coleman v. Larson, supra.*

It is our judgment, therefore, that specific performance be enforced to the extent of a conveyance by Jane Herren and by the administrator and heirs of A. J. Herren to the heirs of E. B. Herren of an undivided one-half interest in the 308 acres of land in controversy. The evidence in the case, equity and good conscience do not justify our going any further.

As to the stock, implements and machinery used in farming the premises, there is no doubt that they were acquired and accumulated in exactly the same way. Undoubtedly, if he gave Ben an undivided half of the land, the father also gave Ben an undivided one-half of all the personal property upon the place used in farming it, and the accumulations and increase thereof. There is no evidence except the circumstances justifying that, and there is absolutely no evidence that the personal property was given to Ben or had been purchased by Ben, or had become Ben's in any other way. The trial court decreed that the estate of E. B. Herren was entitled to all the stock, implements and machinery upon the home place. That decree will be modified so that the decree will be that each estate, and the administrator or administratrix thereof, owns an undivided one-half interest in all such personal property, except certain specific items which the trial court found belonged individually to one or the other of the parties, which will not be changed.

The $3,000 of liberty loan bonds, which were decreed

to be the property of the estate of E. B. Herren, were, to all intents and purposes, conceded by the appellants to so belong, and that portion of the decree will not be changed.

The $9,000 of liberty loan bonds, and the other municipal bonds, were all proven incontrovertibly to have been purchased by A. J. Herren, and to belong to his estate. That part of the decree will stand as to them.

The $1,000 worth of savings stamps, which were given to the daughter, were conceded to have been her property and will remain the same.

The title to two other tracts of real estate were quieted in the estate of E. B. Herren, of which appellants complain that since that was not prayed for by respondents in their complaint and is not involved in this action, was erroneous. Since no one was harmed by that, if it is any benefit to the estate of E. B. Herren, we will not interfere with it.

The cause is remanded with instructions to the lower court to proceed in conformity with this opinion. Appellants, having recovered substantial benefits by their appeal, will be allowed their costs on appeal.

PARKER, C. J., and HOVEY, J., concur.

MACKINTOSH and MAIN, JJ., concur in the result.