DOROTHY V. CRANE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DONALD V. CRANE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4784–65, 4785–65. Filed November 17, 1967.

*Paul R. Hodgson*, for the petitioners.
*G. Phil Harney*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in gift tax for the petitioner Donald V. Crane of $258.48 for the calendar year 1954 and an addition to the tax under section 6651(a) of the Internal Revenue Code of 1954 [1] of $64.62. By amended answer, the respondent increased for 1954 the deficiency for Donald V. Crane to the total amount of $398.15 and the addition to the tax to the total amount of $99.54. For the calendar year 1959, the respondent determined deficiencies in gift tax for the petitioner Donald V. Crane of $16,290.47 and for the petitioner Dorothy V. Crane of $10,695.

The issues for decision are whether the petitioners made a gift of land in 1954 or in 1959, whether the donees of the land contributed

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

any part of the purchase price so as to reduce the value of the gift, and what was the value of the land at the time the gift was made. There is a further issue regarding the transfer in 1959 of insurance policies from Donald to Dorothy, and that issue is whether Dorothy, by virtue of the Oklahoma community property law, had any interest in the policies before the transfer so as to reduce the value of the gift.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners are individuals who were legal residents of Tulsa, Okla., at the time the petitions were filed in this case. The petitioners were husband and wife during the period 1944 through 1960. Petitioner Donald V. Crane filed a U.S. gift tax return on August 5, 1965, for the calendar year 1954, and a gift tax return on April 6, 1960, for the calendar year 1959, with the district director of internal revenue, Oklahoma City, Okla. Petitioner Dorothy V. Crane filed a timely U.S. gift tax return for the calendar year 1959 with the district director of internal revenue, Oklahoma City, Okla.

In his gift tax return for the year 1954, Donald reported a gift valued at $6,250 to Dorothy of the net equity in a 25-acre tract of land in Tulsa County, Okla. (the 25-acre tract); a gift valued at $1,311.28 to Dorothy of the mortgage payments on the 25-acre tract from June to December 1954; a gift valued at $14,000 to Dorothy of an undivided one-half interest in a 160-acre tract of land in Tulsa County, Okla. (the 160-acre tract); and a gift valued at $14,000 of an undivided one-half interest in the 160-acre tract to a constructive trust for the benefit of the petitioners' three children, Patricia Ann Crane, Michael Jay Crane, and Stephen Donald Crane.

In his gift tax return for the year 1959, Donald reported only gifts of various insurance policies to Dorothy and to Donna Williams. In Dorothy's gift tax return for the year 1959, she included a gift to the Dorothy V. Crane Family Trusts valued at $38,000, consisting of her undivided one-half interest in the 160-acre tract.

The Dorothy V. Crane Family Trusts were created on August 20, 1959, for the benefit of Patricia Ann Crane, Michael Jay Crane, and Stephen Donald Crane. On the same date, Donald created the Donald V. Crane Family Trusts for the benefit of Dorothy, Patricia Ann Crane, Michael Jay Crane, and Stephen Donald Crane. Donald and Dorothy each transferred their respective interests in the 160-acre tract to the trusts by quitclaim deeds, which were recorded in Tulsa County, Okla., on September 1, 1959.

On May 12, 1954, Donald and Dorothy purchased the 25-acre tract for their own use and investment. Donald and Dorothy purchased the 160-acre tract on July 9, 1954, for $38,000. Title was first taken

in Dorothy's name, but it was later transferred to both Donald and Dorothy. Their purpose in acquiring the 160-acre tract was to provide an investment to be used for the education of their children. Donald used the same bank account to deposit the funds used for the purchase of the 160-acre tract and the purchase of the 25-acre tract.

In 1954, Donald and Dorothy had a number of savings accounts at a savings and loan association in Ponca City, Okla. The accounts were in the names and had balances on June 30, 1954, as follows:

| Account | Balance June 30, 1954 |
| --- | --- |
| Donald V. or Dorothy V. Crane | $1,839.37 |
| Patricia Ann or Donald Crane | 2,580.77 |
| Michael J. or Donald V. Crane | 641.56 |
| Donald V. or Stephen D. Crane | 784.48 |
| Donald V. Crane | 1,000.31 |
| Dorothy V. Crane or Patricia Crane | 6,352.66 |
| Dorothy V. or Michael J. Crane | 2,181.24 |
| Mrs. Dorothy V. Crane | 2,179.35 |
| Mrs. Dorothy V. Crane or Stephen D. Crane (investment certificate) | 3,000.00 |

Donald furnished all of the funds that went into all these savings accounts. Donald and Dorothy could withdraw funds from any of the savings accounts that were in their respective names.

The 25-acre tract was purchased by Donald with funds obtained from the sale of stock. The tract was mortgaged, and Donald made payments on the mortgage out of his earnings. The 160-acre tract was purchased in part with funds obtained from the above savings accounts and proceeds from the cancellation of certain life insurance policies. One of these life insurance policies, on the life of Stephen Donald Crane, was purchased on June 30, 1946, for a single premium of $3,990.

In 1959, Donald transferred to Dorothy insurance policies on his life that had a value at the date of transfer of $18,122.51. Until this transfer, Donald had the right to change the beneficiaries and ownership. Donald, from 1945 through 1959, paid out of his earnings the annual premiums on six of the life insurance policies that were transferred in 1959 to Dorothy. The cash surrender value of the six policies in 1949, the fourth year of their existence, was $2,227.

Effective in 1949, Oklahoma repealed its community property law. The repealing act provided that the husband and wife could enter into a recordable agreement within 1 year of the effective date of the repealing act setting forth, or altering, the rights acquired by either of them during the community property period. (Okla. Laws 1949, sec. 2, p. 229; Okla. Stat. Ann. tit. 32, sec. 83.) The petitioners did not enter into such an agreement.

The 160-acre tract is generally level land with a slope of approximately 25 feet from south to north. The tract in 1959 was a con-

siderable distance from the nearest housing development, and water and sewer services to the tract were at that time unavailable. The tract was situated next to a cemetery.

A creek ran diagonally across a part of the 160-acre tract. At least since 1942, there has been a dam across the creek on the property just north of the tract that caused water to stand for the most part of every year in the part of the creek that ran across the tract. Drainage in connection with the tract was insufficient in 1959 and affected the value of the land. The fair market value of the 160-acre tract on August 20, 1959, was $800 per acre.

Neither petitioner has used any part of his lifetime specific exemption for any year other than 1954 or 1959.

The issues in this case involve two transfers of property—the life insurance policies that Donald transferred to Dorothy in 1959, and the transfer of the 160-acre tract. The issue with regard to the transfer of the insurance policies is whether Dorothy, by virtue of the Oklahoma community property law, had any interest in such policies before the transfer so as to reduce the value of the gift. In connection with the 160-acre tract, the issues are in what year was it transferred, whether the donees contributed any part of the purchase price of the tract, and what was the fair market value of the tract at the date of its transfer.

The 160-acre tract was purchased in 1954. Title was first placed in Dorothy's name alone, but later, in the names of both Dorothy and Donald. The respondent's contentions are simple. According to his view, Donald made a gift of one-half of the tract to Dorothy in 1954, and in 1959, Donald and Dorothy made gifts of their interests when they established the family trusts.

On the other hand, the petitioners make several contentions and alternative contentions. In the first place, they argue that Dorothy and the children supplied part of the funds used for the purchase of the tract; that to the extent that the children provided the consideration for the purchase a resulting trust arises in their favor; and that since Donald and Dorothy purchased the property for the purpose of providing for the education of their children, they made a gift to the children at that time, and a constructive trust is created to protect the interests of the children. In the alternative, they argue that if a gift was made to Dorothy, the value of such gift must be reduced by the amount of funds which she supplied. Finally, they argue that if Donald and Dorothy did not make gifts of their interests until 1959, the value of their gifts at that time does not include the value of the portion of the 160-acre tract attributable to the consideration supplied by the children.

Our starting point must consequently be an examination of the evidence relating to who among the petitioners and the children sup-

plied funds for the purchase of the tract. An insurance policy on the life of Stephen Donald Crane was purchased on June 30, 1946, for a single premium of $3,990. The petitioners argue that since this policy was purchased during the period when the Oklahoma community property law was in effect, one-half of the premium cost, or $1,995, was supplied by Dorothy. The petitioners then trace Dorothy's $1,995 through to the purchase of the 160-acre tract and argue that Donald's gift to her in 1954 of an undivided one-half interest in the tract must be reduced by the $1,995. For reasons that are expressed in the last part of this opinion involving the 1959 transfer of certain insurance policies from Donald to Dorothy, we find that in 1954 Dorothy owned no interest in the insurance policy on the life of Stephen Donald Crane.

We have found that the Ponca City savings accounts were used in the purchase of the 160-acre tract, and we must therefore decide who owned the savings accounts. Evidence was introduced as to the names in which the various accounts were held, and Dorothy in her testimony referred to the accounts held in more than one name as "joint" accounts. Several questions asked by the petitioners' counsel referred to the accounts held in more than one name as joint accounts, "the whole to the survivor." Our question is whether such evidence is sufficient to support a finding of ownership of these accounts in Dorothy or the children.

The respondent argues that Okla. Stat. Ann. tit. 18, sec. 212b,[2] provides that either party to a joint savings account may withdraw any or all of the funds on deposit. The argument is then made that since Donald had the right to withdraw the funds that he had placed in the accounts in his and Dorothy's or one of the children's names, there was no gift to Dorothy or the children upon depositing funds in such accounts. See *Estate of Sanford* v. *Commissioner*, 308 U.S. 39 (1939); *Burnet* v. *Guggenheim*, 288 U.S. 280 (1933). Therefore, the respondent argues, Donald still owned, for Federal tax purposes, 100 percent of such accounts at the time the 160-acre tract was purchased.

---

[2] Sec. 212b. Shares or membership certificates in joint names of two or more persons or their survivor.—

Every building and loan association and every Federal Savings and Loan Association may issue shares or membership certificates in the joint names of two or more persons or their survivor, in which event any of such persons who shall first act, shall have power to act in all matters relating to the shares or the membership, whether the other person or persons named in such shares or membership certificates be living or not. Such a joint account shall create a single membership in an association. The repurchase or redemption value of an account issued in joint names and dividends thereon, or other rights relating thereto, may be paid or delivered, in whole or in part, to any of such persons who shall first act, whether the other person or persons be living or not. The payment or delivery to any such person or a receipt or acquittance signed by any such person to whom any such payment or any such delivery of rights is made, shall be a valid and sufficient release and discharge of an association for the payment or delivery so made. Laws 1937, p. 319, § 3.

This provision of the Oklahoma Statutes is not, however, dispositive of the question before us. It merely establishes the rights of the depositors with respect to the savings institution. Our question is one of determining the rights of ownership as between the depositors.

When a depositor puts money in a joint account in which he and another are designated as owners, a variety of legal relationships may be created. Each depositor may acquire the ownership of one-half of the account. *Barton* v. *Hooker*, 283 P. 2d 514 (Okla. 1955). There may, or may not, arise a right of survivorship. *Green* v. *Comer*, 193 Okla. 133, 141 P. 2d 258 (1943). The depositor may be acting as trustee holding the account for the other named owner. *Williams* v. *Bailey*, 174 Miss. 760, 165 So. 439 (1936); *Ladner* v. *Ladner*, 128 Miss. 75, 90 So. 593 (1922); 10 Am. Jur. 2d, Banks, secs. 377–389; Annotation, 149 A.L.R. 879, 897 (1944). The ultimate determination of what relationship is created depends upon the intention of the parties.

We have very little evidence to help us determine the intention of the parties. We know the names in which the accounts were established; but we do not have in the record the account cards, the bank books, or any other written evidence reflecting on the ownership of the accounts. In *Hickman* v. *Barrett*, 175 Okla. 262, 52 P. 2d 40 (1935), the court said:

to establish a gift inter vivos, the evidence must be clear, explicit, and convincing in support of every element necessary to constitute a valid gift. * * * [175 Okla. at 265, 52 P. 2d at 43]

In this case, there surely is not such clear evidence of an inter vivos gift. In fact, since Donald provided the funds, since he retained the power and dominion over the accounts, and since he continued to exercise dominion over them, we conclude that in the case of the accounts in which Donald was listed as one of the owners, there was no transfer of ownership of the funds in the account.

The result is different in the case of the savings accounts which were in the name of Dorothy alone or Dorothy and one of the children. In the case of those accounts, Donald apparently retained no control over them and apparently transferred all of his ownership of them. Since we have no evidence suggesting any other allocation of ownership, it appears to us that the most reasonable inference to be drawn is that Dorothy already owned the account which was in her name alone and that in the case of the accounts in the name of Dorothy and one of the children, each party owned a one-half interest in the account. *Baker* v. *Baker*, 187 Misc. 309, 60 N.Y. S. 2d 4 (Sup. Ct. 1946); *Wallace* v. Riley, 23 Cal. App. 2d 654, 74 P. 2d 807 (1937).

Our decision that Dorothy provided part of the funds for the purchase of the 160-acre tract disposes of one issue in the case. The respondent determined that Donald made a gift to Dorothy in 1954 when

the tract was purchased and title placed in both their names. By amended answer, the respondent placed the value of this gift at $19,000, one-half of the purchase price of $38,000. Since Dorothy provided $7,946.30 of this purchase price, the gift to Dorothy in 1954 must be reduced by this amount, resulting in a gift of $11,053.70.

Since we have also decided that the Crane children supplied a part of the funds for the purchase of the 160-acre tract, we must next consider the petitioners' argument that the children consequently acquired part of the tract at the time of its purchase through a resulting trust in their favor. The purchase price of the tract was $38,000, and in accord with our findings of fact and opinion, the children supplied $5,766.95 of this price.

The general rule of Oklahoma law with regard to resulting trusts is statutory. Okla. Stat. Ann. tit. 60, sec. 137, provides: "When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." It has been held that this statute is a codification of the common law with regard to resulting trusts, and it appears from the Oklahoma cases that the common law presumptions are applicable. See *Powell* v. *Chastain*, 318 P. 2d 859 (Okla. 1957); *Staton* v. *Moody*, 208 Okla. 372, 256 P. 2d 409 (1952); *King* v. *Courtney*, 190 Okla. 256, 122 P. 2d 1014 (1941). A more complete definition of a resulting trust appears in *McGill* v. *McGill*, 189 Okla. 3, 4, 113 P. 2d 826 (1941), paragraph 4 of the syllabus by the court:

A resulting trust is one which arises where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears, or is inferred from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title, or to be enjoyed by the holder thereof.

See also *Morton* v. *Williams*, 190 Okla. 374, 123 P. 2d 960 (1942).

One presumption that was made at common law and that has received the express approval of the Oklahoma courts is that if a husband or father supplies the funds to purchase land and places title in the wife or child, a gift, settlement, or advancement to the wife or child is presumed, and absent contrary evidence, a resulting trust will not be imposed. *King* v. *Courtney*, *supra*. However, where the wife or child supplies the funds to purchase land and places title in the husband or father, the presumption is that there is no gift and a resulting trust will be imposed. E.g., *Burnett* v. *Hatch*, 200 Ore. 291, 266 P. 2d 414 (1954); *Ehnes* v. *Yowell*, 374 Pa. 17, 97 A. 2d 56 (1953); *Padgett* v. *Osborne*, 359 Mo. 209, 221 S.W. 2d 210 (1949). These presumptions are of course rebuttable. Bogert, Trusts and Trustees, sec. 460 (2d ed.); 4 Scott, Trusts, sec. 442 (2d ed.).

There are further presumptions in the situation where one party supplies only a part of the purchase price. The rule was originally stated that if the party supplies an aliquot portion of the purchase price—a fraction which is retained in the whole without a remainder—a presumption arises of a resulting trust to the party, but if the party does not supply an aliquot portion of the purchase price, no resulting trust is presumed. *Olcott* v. *Bynum*, 84 U.S. 44 (1872) ; *Herren* v. *Herren*, 118 Wash. 56, 203 Pac. 34 (1921) ; *Schierloh* v. *Schierloh*, 148 N.Y. 103, 42 N.E. 409 (1895). These presumptions are based on the theory that if one is intended to share in the ownership of property, his share and his payment therefor will probably be a simple fraction such as one-fifth or one-third rather than a fraction such as eleven thirty-seconds. But most States now vary from the strict aliquot-aliquant dividing line of the presumptions and require only that either a definite part of the purchase price be paid or the payment be made for a definite part of the realty. E.g., *Hinshaw* v. *Russell*, 280 Ill. 235, 117 N.E. 406 (1917) ; *Skehill* v. *Abbott*, 184 Mass. 145, 68 N.E. 37 (1903). See, generally, Bogert, Trusts and Trustees, sec. 457 (2d ed.).

Regardless of what we believe to be the merits of the various part-payment presumptions, we must apply Oklahoma law. It appears that Oklahoma requires the payment to be made for a definite part of the realty. In *Staton* v. *Moody*, *supra*, the court affirmed a trial court decision that a resulting trust did not arise in a part-payment situation on the following alternative ground :

Also, the trial court's judgment was proper for the further reason that a resulting trust does not exist in favor of one who pays part of the price of land conveyed to another unless such payment has been made for some distinct part or interest therein. * * * [208 Okla. at 375, 256 P. 2d at 412]

We have in the present case a payment by the children of $5,766.95 of a total purchase price of $38,000 with no indication that the payment was for a distinct part or interest in the tract. The presumptions of course may be rebutted, but the only evidence that even remotely suggests that the children were to receive an interest in the tract is the statement by both petitioners that the purpose in acquiring the tract was to provide an investment to be utilized for the education of the children. This is a common goal of many parents, but it is no indication that the parents intend to part with either legal or equitable ownership of the property of the investment. We cannot believe, from the evidence before us, that the children would be regarded by Oklahoma law as owners of any part of the tract at its purchase through a resulting trust. Oklahoma places the burden of proving a resulting trust on the party who seeks its enforcement, and the proof must be "of the most satisfactory kind." *Staton* v. *Moody*, *supra*. This means that the evidence must be clear, unequivocal, and decisive, and not capable of reasonable

explanation on any theory other than that of the existence of a resulting trust. See *Barry* v. *Frizzell*, 371 P. 2d 460 (Okla. 1962); *Marshall* v. *Amos*, 300 P. 2d 990 (Okla. 1956); *Staton* v. *Moody, supra; King* v. *Courtney, supra.* Thus, we conclude that there was no resulting trust in favor of the children because of the use of their funds.

We must next consider the petitioners' argument that since they acquired the 160-acre tract as an investment to be used for the children's education, "irrevocable, oral, constructive, or resulting" trusts were created in 1954 for the benefit of the children. Okla. Stat. Ann. tit. 60, sec. 136, provides:

No trust in relation to real property is valid, unless created or declared:
1. By a written instrument, subscribed by the grantor or by his agent thereto authorized by writing.
2. By the instrument under which the trustee claims the estate affected; or,
3. By operation of law. R.L. 1910, § 6659.

Since petitioners executed no written trust instruments in 1954, they must establish that a trust was created by operation of law. "Trusts created by operation of law are generally referred to as implied trusts, and are of two species, 'resulting' and 'constructive,' which latter are sometimes called 'trust [sic] ex maleficio.' " *Powell* v. *Chastain, supra* at 862. We have already concluded that the use of the funds of the children did not cause the creation of a resulting trust.

The creation of a constructive trust does not depend upon the intention of the party holding legal title. *Healy* v. *Commissioner*, 345 U.S. 278 (1953); Bogert, Trusts and Trustees, sec. 471 (2d ed.); 4 Scott, Trusts, sec. 462.1 (2d ed.). Indeed, a constructive trust is often created contrary to the intention of the holder of legal title since such creation is grounded on fraud or a violation of fiduciary duty by the holder of legal title. *Powell* v. *Chastain, supra.* In other words, a constructive trust is one that is raised where a party obtains legal title to property in an unconscientious and inequitable manner so that the party who is in good conscience entitled to the property will be considered in equity as the beneficial owner. *Powell* v. *Chastain, supra.* A single avowal of acquisition for the use of another, made either contemporaneous with or subsequent to the acquisition of the property, will not of itself support the imposition of a constructive trust. *Raper* v. *Thorn*, 202 Okla. 235, 211 P. 2d 1007 (1949). There must be reliance upon a promise to acquire in trust, and forbearance from taking contemplated action, before a constructive trust can be imposed. *Powell* v. *Chastain, supra; Raper* v. *Thorn, supra.* The burden of proof for imposing a constructive trust is the same as that for a resulting trust. *Barry* v. *Frizell, supra.*

We have no evidence in this case on which we could base a finding of a constructive trust. There was no wrongdoing or abuse of a fiduciary relationship by the petitioners; there was not even a simple

avowal of acquisition of the tract for the use of the children. Both petitioners testified that the purchase of the property in 1954 was not a gift to the children. Accordingly, we find that in 1954 no trust, express or by operation of law, was created by the petitioners for any of the children.

We have found, to this point, that the petitioners made no gifts of any part of the 160-acre tract to the children in 1954. Therefore, under our facts, each petitioner made a gift in 1959 of his undivided one-half interest in the 160-acre tract when the family trusts were established on August 20, 1959. We have now to determine the value of those gifts.

The petitioners argue that we must still give credit in determining the value of the gifts in 1959 to the fact that the children did supply funds for the purchase of the tract in 1954. This we cannot do. As to the savings accounts that were in the names of Donald and one of the children, we found no ownership in the children. As to the savings accounts that were in the names of Dorothy and one of the children, we found ownership of an undivided one-half interest in the child. However, since we did not find a resulting trust on the 160-acre tract in favor of the children as to the portion of the purchase price they contributed, they acquired no interest in the 160-acre tract.

The respondent, in his deficiency notices, determined that on August 20, 1959, the fair market value of the 160-acre tract was $1,200 an acre, or $96,000 for each undivided interest. However, at the trial of this case, the respondent's expert witness testified that the fair market value of the tract on August 20, 1959, was $1,000 an acre. The petitioners introduced the valuations of two experts at the trial. One expert determined a 1959 value of $500–$600 an acre, and the other expert determined a value of $625 an acre. We have found the fair market value of the 160-acre tract on August 20, 1959, to be $800 an acre.

The descriptions of the 160-acre tract we have received from the several experts have been substantially the same with one exception—the amount of standing water on the tract and the extensiveness of the drainage system necessary to remove this water. It was a vacant and unimproved piece of property in the probable path of Tulsa development when purchased, but some distance from the then-existing development. The tract was probably most fit for a housing subdivision, but commercial or industrial development was also possible.

The respondent's expert on valuation seemed better qualified and presented us with a more reasoned analysis than the petitioners' two experts. The tract was not an easy one to value in 1959. We have no evidence that it produced any income, it was totally undeveloped, and comparable sales were few. However, the respondent's expert did base his valuation on a number of sales in the area from 1957 through 1962 and attempted to relate these sales to the value of the 160-acre tract.

The petitioners' experts, on the other hand, did not consider that other sales in the area were sufficiently comparable to be of much assistance and based their valuations of the tract mostly on their subjective knowledge of the Tulsa real estate market. Neither of the petitioners' experts had the qualifications as an appraiser, as distinguished from a dealer in real estate, that the respondent's expert had. We have therefore concluded that we must base our valuation of the tract primarily on the testimony of the respondent's expert.

The petitioners introduced evidence that sales of large undeveloped tracts of land in the Tulsa area are usually financed through purchase-money mortgages of a long-term nature. The petitioners argue that any comparable sales involving long-term financing should be substantially discounted since the cash value of such mortgages is generally only slightly more than one-half of the face value of the mortgages. However, the petitioners' arguments in this regard were not very specific and from the testimony before us, we can arrive at no set discount to apply to comparable sales. We assume that the discount would vary with the interest on the mortgage, the value of the security, the reliability of the borrower, and the length of the mortgage. In addition, the respondent's expert took into consideration the financing arrangements on the sales of other tracts and discounted the prices of those tracts that were sold through such long-term financing.

The petitioners also argued that the owner of the land adjoining the 160-acre tract had in or before 1942 constructed a dam on the creek that ran through both parcels of land backing up water on the 160-acre tract. The petitioners argue that this landowner, through the continuous and open backup of this water since 1942 or before, may have acquired prescriptive easement rights to the 160-acre tract. However, the petitioners have not proven that the backup of the water was hostile and done without the consent of the previous owner or owners of the 160-acre tract, and therefore, we cannot consider the possibility of an easement by prescription in determining the value of the 160-acre tract. See *Farris* v. *Smallwood*, 204 Okla. 123, 227 P. 2d 644 (1951); *Fernow* v. *Pfile*, 198 Okla. 308, 178 P. 2d 106 (1947); *Anderson* v. *Francis*, 177 Okla. 47, 57 P. 2d 619 (1936).

The respondent's expert found that the tract as a whole had a fair market value of $160,000, or $1,000 an acre, on August 20, 1959. Since the tract was jointly owned by Donald and Dorothy, the respondent's expert considered that each undivided one-half interest in the tract had a fair market value on August 20, 1959, of $77,500. However, we think that these values need to be reduced by reason of the drainage problem. The petitioners placed in evidence the testimony of an expert who made an engineering study of the cost of drainage necessary to utilize the tract for a housing development. This expert determined that proper drainage for the tract would cost $62,539 more than would

normal drainage for a normal tract of land this size. The respondent's expert witness was aware of the water standing on the tract, but he had no engineering report on the cost of providing adequate drainage. In his opinion, any large tract of undeveloped land presented some special problems, and he considered that the cost of providing drainage for this tract would not exceed the normal costs for similar tracts. The respondent also introduced another witness who expressed the opinion that the water problem was not as serious as the petitioners' witness believed and that drainage could be provided at considerably less cost. In summary, it appeared to us that the petitioners' evidence shows that there was an abnormal drainage problem on this tract but that it is not as serious as indicated by the petitioners' evidence. To take account of this problem, we have concluded that the $1,000-an-acre valuation should be reduced $200 an acre, or that the tract should be valued at $800 an acre. A corresponding adjustment of the value of the undivided one-half interest reduces it to $62,000.

Accordingly, we find that each petitioner made a gift of an undivided one-half interest in the 160-acre tract on August 20, 1959, and that each such interest had a value on that date of $62,000.

Another issue in this case concerns the transfer from Donald to Dorothy in 1959 of a number of insurance policies on his life. The value of these policies on the date of transfer was stipulated to be $18,122.51. The basic issue in regard to the transfer of the life insurance policies is whether Dorothy, by virtue of the Oklahoma community property law, had any interest in these policies before their transfer so as to reduce the value of the gift.

Of the policies that were transferred by Donald in 1959, six were purchased in 1945. Premiums on these six policies were paid out of earnings. Oklahoma adopted a community property law in 1945 [3] that was repealed effective June 2, 1949. In the fourth year of their existence, which was 1949, the six policies had a total cash surrender value of $2,227. The petitioners therefore argue that Dorothy owned one-half of the value of the policies in 1949, or $1,113.50.[4]

In *Davis' Estate* v. *Oklahoma Tax Commission*, 206 Okla. 644, 246 P. 2d 318 (1952), the court said in its syllabus:

---

[3] Oklahoma in 1939 had enacted a community property law that applied to husbands and wives and their property only after the filing of a written election to come under its terms. The 1945 law was one of general application that applied to all property acquired by either the husband or wife during marriage. See Okla. Stat. Ann. tit. 32, sec. 851–82, historical note.

[4] Okla. Laws 1945, sec. 3, p. 118 (Okla. Stat. Ann. tit. 32, sec. 82, provided:

All property acquired by either the husband or wife during marriage and after the effective date of this Act, except that which is the separate property of either as hereinabove defined, shall be deemed the community or common property of the husband and wife, and each shall be vested with an undivided one-half interest therein; * * *

Where community funds of husband and wife, while the Community Property law was in force and effect, were used to pay premiums on deceased husband's life insurance policies, taken out during coverture, in which policies the wife was the beneficiary, only one-half of the proceeds collected under the policies, less than $20,000 allowed as an exemption, were subject to inheritance taxes, as a part of husband's gross estate.

The court then stated in the opinion that:

wife's interest in community property is not a contingent or expectant interest but a present, undivided one-half interest, and the separate character of the separate interest of a spouse in community property continues as long as it can be clearly traced and identified. * * * [206 Okla. at 646, 246 P. 2d at 320]

*Davis' Estate* supports the petitioners' argument that Dorothy had a vested interest in one-half of the value of the six policies in 1949. However, the respondent contends that as a result of the community property repealing act (the repealing act), Dorothy has lost any interest that she may have had in the policies. The repealing act provided procedures under which husbands and wives could establish of record their rights to property acquired under the community property law and further provided that after 3 years, no action or proceeding of any character could be brought to establish or recover an interest in property based upon the terms of the community property law unless the interest had previously been established of record.[5]

The petitioners did not enter into an agreement specifying the rights acquired by each of them under the community property law. The respondent therefore argues that Dorothy forfeited any interest she might have had in Donald's life insurance policies. The respondent relies upon *Hiskett* v. *Wells*, 351 P. 2d 300 (Okla. 1959), in which the question was considered of whether a party could be estopped from the use of the 3-year statute of limitations provided in section 2 of

---

[5] Okla. Laws 1949, sec. 2, p. 229 (Okla. Stat. Ann. tit. 32, sec. 83), provides as follows:

Within one (1) year from the effective date of this Act [June 2, 1949], any husband and wife whose property or income was subject to the terms of the Act [the community property law] repealed by the foregoing section, may enter into a recordable agreement, specifying the rights acquired by either or each of them under the terms of said Act, altering those rights if they so desire, and describing the property affected, and may record the agreement in the office of the county clerk of their residence and in the office of the county clerk of each county where any of the affected property may be located. Should any husband and wife be unable to reach such an agreement, either may file an action in the District Court of the county of the residence of either of them for a determination of the rights as acquired under the repealed Act, and a certified copy of the judgment may thereupon be recorded in each county in which any of the affected property is located. The failure to make and record such an agreement, or to file such an action within one (1) year and record the judgment in due course thereafter, and in any event within three (3) years from the effective date of this Act, shall bar the husband or wife whose title or interest does not appear of record, or who is not separately in possession of the property, from any claim or interest in the property as against third (3rd) person acquiring any interest therein. After three (3) years from the effective date of this Act, no action or proceeding of any character shall be brought to establish or recover an interest in property based upon the terms of the Act repealed, unless the interest has previously been established of record, as hereinabove provided.

the repealing act. The court held that the 3-year period provided in section 2 was not merely a remedial statute of limitations but a condition on the right to bring an action, and therefore, reliance on the statute of limitations could not be defeated by a plea of estoppel. The court stated that:

These provisions [of sec. 2] show clearly that it was the intention of the Legislature that if no action or proceeding was started by June 2, 1952, claimants would be forever foreclosed from asserting their claims in court. * * * [351 P. 2d at 304]

The petitioners insist that the respondent has misconstrued *Hiskett* v. *Wells* since, the petitioners argue, if a spouse had obtained a vested property right by virtue of the community property law, the taking away of that right after the 3-year limitation period, as implied by *Hiskett* v. *Wells*, would be a taking of property by State action without due process of law. The petitioners' argument is that vested property rights may not be abrogated by statute without a violation of the 5th or 14th amendments of the United States Constitution. The petitioners rely upon *Choate* v. *Trapp*, 224 U.S. 665 (1912), which involved the attempted abrogation by Federal statute of certain vested rights acquired by the Choctaw and Chickasaw Indians under a previous Federal statute.

The petitioners would have us believe that section 2 of the repealing act should be interpreted, despite *Hiskett* v. *Wells*, *supra*, as a remedial statute of limitations that does not change the rights of the parties but merely serves as a bar to the enforcement of such rights. The petitioners rely upon the maxim that a court should avoid giving a statute an unconstitutional meaning.

We cannot agree with the petitioners' arguments. *Hiskett* v. *Wells*, *supra*, indicates to us that the Oklahoma Legislature intended, in enacting section 2 of the repealing act, to put to rest, after a specified period of time, all claims arising from the community property law that did not appear of record. From the face of section 2, it appears to us that the Oklahoma Legislature intended to affect vested property rights.

Further, we do not believe that the due process clause of the 14th amendment is a general prohibition against the impairment of vested property rights. Much legislation affects vested property rights to some extent. The 14th amendment by its terms provides simply that "nor shall any State deprive any person of life, liberty, or property, without due process of law." And in *Nebbia* v. *New York*, 291 U.S. 502, 525 (1934), the Supreme Court stated:

The Fifth Amendment, in the field of federal activity,[14] and the Fourteenth, as respects state action,[15] do not prohibit governmental regulation for the public

welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. * * * [Footnotes omitted.]

The State of Oklahoma has a great and vital interest in the welfare of the family unit and the economic relationship of the husband and wife. The State also has a vital interest in assuring the clarity of ownership of property so that innocent purchasers may be protected and economic intercourse encouraged. Section 2 of the repealing act seems to us to be a very fair and reasonable method of achieving the State's goals of protecting property rights and, in particular, rights between spouses.

In the first place, the State does not set out to abrogate vested property rights at all. The State merely requires that these rights be placed of record. The husband and wife are free to arrange their interests in any manner they see fit. Secondly, the husband and wife may follow a reasonable procedure and have access to the courts for a period of time should they not be able to agree between themselves as to their respective interests. The only abrogation of a vested property right results from the inaction of the husband or wife.

A community property law engrafted onto a common law system of property for a short and temporary period does result in confusion of ownership and can upset the free transferability of property interests. The benefit to the people of Oklahoma from allaying this confusion clearly outweighs the detriment to individuals who refused to avail themselves of a simple and reasonable procedure for establishing their property rights.

We must reach the conclusion that the State of Oklahoma did intend the repealing act to affect substantive property rights. Since petitioners did not file the agreement provided for in section 2 of such act, Dorothy had no ownership interest in the six life insurance policies in question at the time of the gift to her in 1959.

In summary, each petitioner made a gift, having a value of $62,000, of an undivided one-half interest in the 160-acre tract on August 20, 1959. In addition, Donald made a gift to Dorothy in 1959 of a number of life insurance policies having a value of $18,122.51. Donald has not separately contested the respondent's determination of an addition to the tax under section 6651 (a) for the year 1954, and such determination is approved to be recomputed in the Rule 50 computation.

*Decisions will be entered under Rule 50.*